The Honorable Bill Bunten State Senator, 20th District State Capitol, Room 460-E Topeka, Kansas 66612
Dear Senator Bunten:
As Senator for the 20th District, you request our opinion regarding whether a city that has created a redevelopment district and adopted a redevelopment plan pursuant to K.S.A. 12-1770 et seq. may use tax increment revenues, or the proceeds of bonds or notes issued under these statutes, to reimburse qualified "redevelopment project costs" incurred in the planned redevelopment district prior to the time the city completed the statutory procedure for creating the redevelopment district and adopting the redevelopment plan.
The legislatively stated purpose for enactment of the Tax Increment Finance Act (TIF)[1] is to "promote, stimulate and develop the general and economic welfare of the state of Kansas and its communities and to assist in the development and redevelopment of eligible areas within and without a city thereby promoting the general welfare of the citizens of this state. . . ."[2] The redevelopment is pursued by a city through a two-step process, with the first step being establishment of a redevelopment district within an eligible area.[3] In order to determine whether an area constitutes an eligible area, the city's governing body is required to conduct a public hearing.[4] An eligible area may be "a blighted area, conservation area, enterprise zone, historic theater, major tourism area or a major commercial entertainment and tourism area as determined by the secretary [of commerce]."[5] Once the redevelopment district has been established, the city's governing body may adopt an ordinance that sets forth the redevelopment district plan.[6] The "`[r]edevelopment district plan' or `district plan' [is] the preliminary plan that identifies all of the proposed redevelopment project areas and identifies in a general manner all of the buildings, facilities and improvements in each that are proposed to be constructed or improved in each redevelopment project area."[7]
A city is authorized "to issue special obligation bonds in one or more series to finance the undertaking of any redevelopment project. . . ."[8]
The proceeds of the special obligation bonds may be used to pay redevelopment project costs.[9]
 "`Redevelopment project costs' means those costs necessary to implement a redevelopment plan, including, but not limited to costs incurred for:
 "(1) Acquisition of property within the redevelopment project area;
"(2) payment of relocation assistance;
"(3) site preparation including utility relocations;
"(4) sanitary and storm sewers and lift stations;
 "(5) drainage conduits, channels, levees and river walk canal facilities;
 "(6) street grading, paving, graveling, macadamizing, curbing, guttering and surfacing;
"(7) street light fixtures, connection and facilities;
 "(8) underground gas, water, heating and electrical services and connections located within the public right-of-way;
"(9) sidewalks and pedestrian underpasses or overpasses;
 "(10) drives and driveway approaches located within the public right-of-way;
"(11) water mains and extensions;
"(12) plazas and arcades;
"(13) parking facilities;
 "(14) landscaping and plantings, fountains, shelters, benches, sculptures, lighting, decorations and similar amenities; and
 "(15) all related expenses to redevelop and finance the redevelopment project.
 "Redevelopment project costs shall not include costs incurred in connection with the construction of buildings or other structures to be owned by or leased to a developer, however, the `redevelopment project costs' shall include costs incurred in connection with the construction of buildings or other structures to be owned or leased to a developer which includes an auto race track facility or is in a redevelopment district including some or all of the land and buildings comprising a state mental institution closed pursuant to section 2 of chapter 219 of the 1995 Session Laws of Kansas."[10]
In order to determine whether redevelopment project costs that are incurred by a developer prior to the time that the city completed the statutory procedure for creating the redevelopment district and adopting the redevelopment plan are reimbursable, we resort to the rules of statutory construction.
 "The interpretation of a statute is a question of law subject to unlimited review. The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. However, where the intent is not clearly expressed, courts are not limited to consideration of the language employed but may properly look into the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effect the statute may have under various suggested constructions. A statute should never be given a construction that leads to uncertainty, injustice, or confusion if possible to construe it otherwise. In construing a statute, words and phrases should be construed according to context and the approved usage of the language, and words in common use are to be given their natural and ordinary meaning."[11]
The TIF Act does not include a provision that states whether reimbursable redevelopment project costs include costs that are incurred prior to the time that a redevelopment district is created and a district plan is adopted. Therefore, we look to the legislative intent in order to address this matter.
Legislative intent may be determined by reviewing K.S.A. 12-1773. The statute addresses a city's authority to acquire real property located in a redevelopment district. "Any city which has adopted a project plan in accordance with the provisions of this act may purchase or otherwise acquire real property in connection with such project plan."[12] The statute clearly restricts the acquisition of property by the city to a time following adoption of a project plan.[13] Neither this particular phrase, nor any similar phrase, is applicable when a city is reimbursing redevelopment project costs. "[I]n construing statutes and determining legislative intent, several provisions of an act or acts, in parimateria, must be construed together with a view of reconciling and bringing them into workable harmony if possible."[14] "The Legislature is presumed to know the law."[15] If the Legislature had intended that only redevelopment costs incurred after completion of the process for establishing a redevelopment area and adoption of a project plan be reimbursable, it could have included a provision similar to the one regarding acquisition of real property. Given the difference in the language in the statutes, we determine that the Legislature did not intend to restrict a city's ability to reimburse redevelopment project costs to only those costs incurred after the city completed the statutory procedure for establishing a redevelopment area and adopting a project plan.
This interpretation is supported when considering the history of the Kansas TIF Act. The TIF Act was originally enacted in 1976[16] and was considered to be fairly restrictive when compared to similar legislation enacted in other states.[17] Any redevelopment plan undertaken at that time was required to "fix a date on which the redevelopment shall: (1) Commence, which date shall not be more than one (1) year from the date that any property is acquired by the city following adoption of the plan; and (2) be completed, which date shall be not more than five years from the date the plan was adopted."[18] At that time, as now, a city could not exercise its eminent domain powers for the purpose of acquiring property until after a redevelopment plan had been adopted.[19] In reading these provisions together, the TIF Act as originally enacted required that the redevelopment plan establish a date specific for commencement of the redevelopment. Such date was to be within one year of the date on which the city acquired property, an action that could occur only after adoption of the plan. The Legislature, by requiring that the plan be adopted before the redevelopment began, precluded reimbursement of costs incurred prior to the commencement date established in the plan. In 1988, however, the language regarding a commencement date was deleted from the statute such that each plan was required only to fix a date for completion.[20] "When the legislature revises an existing law, it is presumed that the legislature intended to change the law."[21] Following the 1988 amendments, activities leading to redevelopment could commence prior to the time that a redevelopment plan was adopted by a city. Therefore, a city is no longer precluded from using tax increment revenues or the proceeds of bonds or notes issued under the TIF Act provisions to reimburse qualified redevelopment project costs incurred in the planned redevelopment district prior to the time the city completed the statutory procedure for creating the redevelopment district and adopting the redevelopment plan.
The authority of a city to reimburse project costs is not unlimited, however. As previously noted, eligible areas for redevelopment pursuant to the TIF Act include "a blighted area, conservation area, enterprise zone, historic theater, major tourism area or a major commercial entertainment and tourism area. . . ."[22] Unless the redevelopment district is located in an area designated by statute and is to contain an auto race track facility,[23] the governing body for the city must conduct a public hearing before determining whether a proposed redevelopment district is an eligible area.[24] The statutes establish the criteria to be considered in making that determination.[25] Project costs may be reimbursed only if the city actually establishes a redevelopment district and adopts a redevelopment plan. It is therefore our opinion that K.S.A. 2002 Supp. 44-550b does not close the records in question and that the KDHR cannot properly rely upon K.S.A. 2002 Supp.45-221 to close portions of the public record in question.
Sincerely,
 PHILL KLINE Attorney General of Kansas
 Richard D. Smith Assistant Attorney General
PK:JLM:RDS:jm
[1] K.S.A. 12-1770 et seq.
[2] K.S.A. 12-1770.
[3] K.S.A. 12-1771.
[4] See K.S.A. 12-1771.
[5] K.S.A. 12-1770a(g), as amended by L. 2003, Ch. 97, § 1 and L. 2003, Ch. 154, § 3.
[6] K.S.A. 12-1771(b); 12-1772.
[7] K.S.A. 12-1770a(s), as amended. See also K.S.A. 12-1771(b).
[8] K.S.A. 12-1774(a)(1), as amended by L. 2003, Ch. 97, § 4 and L. 2003, Ch. 154, § 6. See also K.S.A. 12-1770; 12-1774(a)(3), as amended.
[9] K.S.A. 12-1773(b).
[10] K.S.A. 12-1770a(q), as amended.
[11] O'Donoghue v. Kansas Farm Bureau Mut. Ins. Co., Inc., 275 Kan. 430,432-33 (2003) (internal citations omitted).
[12] K.S.A. 12-1773(a) (emphasis added).
[13] State ex rel. Tomasic v. Unified Gov't of Wyandotte County/KansasCity, 265 Kan. 779, 808 (1998).
[14] State ex rel. Morrison v. Oshman Sporting Goods Co., 69 P.3d 1087,1091 (Kan. 2003).
[15] In re J.M., 44 P.3d 429, 433 (Kan. 2002).
[16] L. 1976, Ch. 69. The TIF was amended in 1979 to address concerns regarding the constitutionality of the Act. See L. 1979, Ch. 52; Stateex rel. Schneider v. City of Topeka, 227 Kan. 115 (1980).
[17] See L. 1976, Ch. 69; Performance Audit Report, Tax Increment Financing in Kansas, Part II: Reviewing a Sample of Districts, April 1997.
[18] L. 1976, Ch. 69, § 2(d).
[19] L. 1976, Ch. 69, § 4(a).
[20] See L. 1988, Ch. 78, § 2(g).
[21] American Trust Administrators, Inc. v. Sebelius, 44 P.3d 1253,1258 (Kan. 2002).
[22] K.S.A. 12-1770a(g), as amended.
[23] See K.S.A. 12-1771b, as amended by L. 2003, Ch. 154, § 4.
[24] K.S.A. 12-1771.
[25] K.S.A. 12-1770a as amended.